JUDGE KEENAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14 CV 4639**

---------------------------------------------------------------x

CALLSOME SOLUTIONS, INC.,

                   Plaintiff,

    vs.

GOOGLE, INC.,

                Defendant.

---------------------------------------------------------------x

Case No. _____

**COMPLAINT**
**JURY TRIAL DEMANDED**

RECEIVED
JUN 25 2014
U.S.D.C. S.D. N.Y.

Plaintiff, Callsome Solutions, Inc. ("Callsome"), files its Complaint against Defendant,

Google, Inc. ("Google"), and alleges the following:

## NATURE OF THE CASE

1.    This is an action against Google for intentionally misrepresenting to third parties

and Callsome that Callsome's Post Call Manager ("PCM") Software Development Kit ("SDK")

violated Google's ad policy as set forth in the "Google Play Developer Program Policies."

## PARTIES AND JURISDICTION

2.    Callsome Solutions, Inc., is a Delaware corporation, with its principal office

located at 839 West End Avenue, #4F, New York, NY 10025.

3.    Google, Inc., is a publicly traded Delaware corporation, whose headquarters is

located at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  Google also maintains an

office at 76 Ninth Avenue, 4th Floor, New York, NY 10011.

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties in

this case are citizens of different states and the amount in controversy exceeds $75,000.

5.    Venue is properly brought in this Court pursuant to 28 U.S.C. § 1391.

- 1 -

**GOOGLE**

6.     Google is a globally recognized technology leader that offers products and services to consumers.  Although best known for its Google search engine, Google is also known for its Android operating system and its consumer products, which include its Google Nexus tablet, Google Glass and Chromecast.

7.     Android is an open-source operating system software that is owned by Google, but is made available to the public for free.  This open-source model allows anyone to view, modify and customize the Android operating system.  The customizable nature of Android has resulted in manufacturers using it as their operating system in mobile phones, tablets, netbooks, televisions and even game consoles.  Developers also use Android to create applications or "apps" for these devices.  To begin using Android, a potential developer simply downloads the Android SDK.

8.     The popularity of Android is manifest.  As of September 2013, over a billion mobile devices had been activated that were running Android.[1]  According to Google, "every day another million users power up their Android devices for the first time and start looking for apps, games, and other digital content."  *See* http://developer.android.com/about/index.html (last visited June 24, 2014).

9.     Android users seeking to find, download and use apps, games and other digital content primarily turn to Google's digital entertainment store, Google Play.  Google Play is the "premier market place for selling and distributing Android apps."  *See* http://developer.android.com/about/index.html.

---

[1] *See* https://www.sec.gov/Archives/edgar/data/1288776/000128877614000020/goog2013123110-k.htm#sD639E991EBB55393BBAF2E71A87E5ECB.

10.     Although not the only app store available to Android users, Google utilizes two particularly effective methods to maintain the Google Play as the premier market place: licensing agreements and user warnings.[2]

11.     Most hardware manufacturers who install Android on their devices want the utility, recognition and goodwill associated with Google's apps, such as Maps, Search and YouTube.  Accordingly, these manufacturers enter into licensing agreements with Google to pre-load its apps onto their devices.  Google does not allow device manufacturers to pick and choose which Google apps to pre-load.   Rather, under the licensing agreements, the device manufacturers must agree to offer a bundle of Google apps, including Google's Play Store, Gmail, Maps, YouTube and Calendar, among others.  Device manufacturers must also agree to set Google's search engine as the default search provider for all web searches.  Thus, device manufacturers who want to install Google's apps on their devices must install the Google Play Store.

12.     Users who venture beyond Google Play and attempt to download an app or other digital content are confronted with Google's prominent warning that downloading apps from unknown sources could harm the user's device and the user is responsible for any damage caused by downloading apps outside of the Google Play store.

13.     Google's actions to maintain the Google Play store as the premier market place for Android apps and digital content has been effective as "Android users download more than 1.5 billion apps and games from Google Play each month."   *See* http://developer.android.com/about/index.html.

---

[2] Google Play is not the only app store available for Android devices as Amazon and Samsung, among others, offer app stores.

14.     Although Google offers the Google Play store to Android users, it is not the primary developer of the over one million apps on its store.  Rather, third parties develop the apps.  Some of these developers are large corporations, such as Google, but the vast majority are individuals or small startup companies like Callsome.  *See* Amy Cravens, *A demographic and business model analysis of today's app developer* (2012) (http://research.gigaom.com/report/a-demographic-and-business-model-analysis-of-todays-app-developer/) (last visited June 24, 2014).

15.     Google permits persons to develop and publish apps on the Google Play store by signing up for a developer account and agreeing to Google's "Developer Distribution Agreement" ("Developer Agreement"), a copy of which is attached as Exhibit A.  A developer cannot distribute any apps on the Google Play Store without first agreeing to the Developer Agreement.  As the Developer Agreement plainly states, it "forms a legally binding contract" that governs the parties' relationship with respect to distributing apps on the Google Play store.

16.     The Developer Agreement places the responsibility on the app developer to upload the app to the Google Play store, disclose all information required by Google to Android users, provide any necessary customer support and adhere to the "Google Play Developer Program Policies" ("Developer Policies"), a copy of which is attached as Exhibit B.

17.     The Developer Agreement also includes a product takedown provision that permits Google to remove apps from the Google Play store.  This provision, in relevant part, states:

> While Google does not undertake an obligation to monitor the Products or their content, if Google is notified by you or otherwise becomes aware and determines in its sole discretion that a Product or any portion thereof or your Brand Features . . . (g) violates the terms of this Agreement or the Developer Program Policies for Developers . . . Google may remove the Product from the Market

or reclassify the Product at its sole discretion.  Google reserves the right to suspend and/or bar any Developer from the Market at its sole discretion.

*See* Developer Agreement at ¶7.2.

18.    Google's Developer Policies set forth Google's policies with respect to content, promotion and advertising.  Relevant to this case is Google's ad policy, which provides:

**1.  Developer Terms apply to the entire user experience of your app**

Please be aware that Google's Developer Distribution Agreement and Developer Program Policies (together, "Developer Terms") apply to each app as well as any ads or third-party libraries bundled or made available through the app.  Offer your users a consistent, policy compliant, and well communicated user experience.

Ads are considered part of your app for purposes of content review and compliance with the Developer Terms.  Therefore all of the policies referenced above also apply.  Please take care to use advertising which does not violate the Developer Terms.

Ads which are inconsistent with the app's content rating also violate our Developer Terms.

**2.  Ads Context**

Ads must not simulate or impersonate the user interface of any app, or notification and warning elements of an operating system.  It must be clear to the user which app each ad is associated with or implemented in.

**3.  Ad Walls and Interstitial Ads**

Interstitial ads may only be displayed inside of the app they came with.   Forcing the user to click on ads or submit personal information for advertising purposes in order to fully use an app is prohibited.   A prominent and accessible target must be made available to users in any interstitial ad so they may dismiss the ad without penalty or inadvertent click-through.

**4.  Interfering with Apps and Third-Party Ads.**

Ads associated with your app must not interfere with other apps or
their ads.

*See* Developer Policies at 5-6 (emphasis in original).

19.     A developer that agrees to Google's Developer Agreement and Developer
Policies may design, develop and publish apps to the Google Play store.  This access is very
desirable to developers because "Google Play is the premier market place for selling and
distributing Android apps.  When you publish an app on Google Play, you reach the huge
installed base of Android." *See* http://developer.android.com/about/index.html.

20.     Google also promotes Google Play as being an "open marketplace" that gives
developers the control to decide when to publish, who to publish to and what devices to focus on.
Google represents to developers that they "can monetize in the way that works best for your
business—priced or free, with in-app products or subscriptions—for highest engagement and
revenues.  You also have complete control of the pricing for your apps and in-app products and
can   set   or   change   prices   in   any   supported   currency   at   any   time." *See*
http://developer.android.com/about/index.html.

21.     If developers want to use ads to monetize their apps, Google offers its Google
Mobile Ads SDK which makes use of Google's AdMob, DoubleClick and AdSense publishers.
Developers may also choose to use other mobile advertising SDKs, such as StartApp, Flurry,
Tapjoy or InMobi.

22.     The perceived control with which developers have to publish, promote and
monetize their apps is facilitated by the fact that Google does not pre-screen apps that are
published on the Google Play store.  Rather, users, developers or other persons may report apps
that violate Google's policies.  As set forth above, Google also voluntarily monitors apps that are
published on the Google Play store for compliance and issues warning notices to developers

whose apps it determines violate its Developer Agreement and Developer Policies.   Google suspends apps whose developers do not bring their apps into compliance with Google's Developer Agreement or Developer Policies after receiving warning notices.

## CALLSOME

23.     Callsome is a startup company that designed and developed CallFlakes. CallFlakes is a free app that is offered to users of Android mobile phones and is published on the Google Play store.

24.     CallFlakes is a utility app that enhances a user's productivity with respect to two of the most commonly used smartphone activities:   telephone calls and text messages. Specifically, after ending a telephone call, CallFlakes opens a productivity board that allows users to call the person back, text the person back, send an email, set a meeting, set a reminder or search the internet for topics related to the call.   Similarly, when a text message is received, CallFlakes opens a productivity board that allows the user to respond, call, set a meeting, set a reminder or search the web for topics related to the message.   CallFlakes also has the added optional functionality of Facebook caller ID, which allows users to see Facebook friends' posts prior to starting a conversation with the Facebook friend.

25.     After releasing CallFlakes, Callsome developed a win-win solution that would benefit app developers and their users alike:  Post Call Manager ("PCM").

26.     PCM is a "lite" version of CallFlakes that opens a productivity board, like the one in CallFlakes, after the user ends a telephone call.[3]   Rather than use Google's search engine to power users' internet searches, PCM used Yahoo search which was powered by Microsoft's Bing search engine.   PCM also shows a small banner advertisement along with the productivity

---

[3] PCM is a lite or reduced version of CallFlakes because it does not open the productivity board after a text message is received or offer the Facebook caller ID functionality.

board and provides a link that the user can press to see an app wall with other apps the user might be interested, but is not obligated to, in downloading.

27. To implement its win-win solution, Callsome partnered with Interchan, an app developer, and StartApp, a mobile advertising platform.

28. On April 24, 2013, Interchan agreed to integrate the PCM SDK as part of the apps it developed and published. In return for offering the additional functionality to Interchan's users, Callsome received 25% of the advertising revenue that was generated. Interchan used Google's AdMob as the ad server for its apps.

29. StartApp marketed the PCM SDK as an "ad unit" to entice app developers to integrate it into their apps. StartApp informed app developers that PCM would provide their users "an easy way to perform essential tasks once they end a call on their phone. The [PCM] allows users to quickly call back, reply via SMS, send an email, create a calendar event, search the web, and more. The [PCM] SDK is also based on our popular pay-per-download model." *See* http://blog.startapp.com/announcing-suite-sdks/ (last visited June 24, 2014). Thus, developers who integrated the PCM SDK into their app provided their users the added functionality of PCM while also monetizing their app.

30. The additional functionality provided by PCM was not clandestinely installed onto users' phones. Rather, after downloading an app that integrated the PCM SDK, users were notified that they could also download PCM. The PCM widget and app would be installed and activated only with the user's acknowledgement and consent. If the user decided not to install PCM, the user would still be able to download the app without consequence.

31. Most users decided to install and retain the benefits offered by PCM. An example of a screenshot a user might see when interacting with PCM after a call is set forth below:



32.     The productivity board reveals that a user can dismiss it at any time by clicking on the "X" at the top right of the productivity board.  The user can uninstall PCM at any time by clicking on "Disable" at the top left of the productivity board.  The productivity board plainly notifies the user that the productivity board is powered by the app developer that integrated the PCM SDK into the app that was downloaded by the user.  Finally, as noted above, the productivity board shows a small banner ad at the bottom of the screen and permits, but does not require, the user to download other free apps by clicking on the associated icon.

33.     On or around April 2013, StartApp and Callsome test launched the PCM SDK. Callsome offered the PCM SDK to a limited group of developers to gauge developer interest, evaluate the effectiveness of the monetization strategy and fix any software bugs or glitches.

34.    Callsome and StartApp officially launched the PCM SDK on September 15, 2013. This method of distribution turned out to be beneficial and popular for Callsome, developers and users alike.   By the end of September, Localytics, an analytics company, sent an email to Callsome which said that PCM was third in data points the previous week, just behind Tumblr and iHeart radio.

35.    By late November 2013, developers had chosen to integrate the PCM SDK in over 800 apps.  By the end of November 2013, less than three (3) months since its official launch, users had downloaded PCM more than 46 million times and logged approximately 1.3 billion user app sessions.  Despite having the option to easily uninstall PCM, only a fraction of users chose to do so.  Most users used PCM's added functionality on a daily basis to enhance their productivity.

36.    The popularity of the PCM SDK among developers and users resulted in Callsome generating a profit from advertising revenue.

37.    The growth, popularity and success of the PCM SDK was so tremendous that other companies sought to partner with Callsome to distribute its PCM SDK.   Specifically, Callsome began negotiating with Ask Partner Network and Massive Impact to begin distributing the PCM SDK.

## GOOGLE'S WARNING NOTICES

38.    In November 2013, Google began sending suspension warning notices, via e-mail, to app developers who had integrated the PCM SDK into their apps.

39.    Although the PCM SDK works the same no matter what app it is integrated into, Google gave different reasons for why the PCM SDK had to be removed.

40.     One developer was told that his app violated section 4.3 of the Developer Agreement because it uploaded users' call logs to a service without informing and obtaining user consent.  Google informed this developer that the app could be reinstated if it was brought into compliance with section 4.3 of the Developer Agreement.  Subsequently, Google informed the developer that it would reinstate the app if the developer removed "net.mz.callflakessdk."  This is the PCM SDK.  This reason was false because the PCM SDK does not upload or otherwise track users' call logs.

41.     Other developers were told that their apps violated the ad policy in Google's Developer Policies:[4]

> **REASON FOR WARNING**: Violation of the Ad-Policy:
>
> - Ads associated with your app must not interfere with other apps or their ads.
>
> After a regular review, we have determined that your app contains ad functionality which disrupts or interferes with the usage of other apps or their ads. This is in violation of the policy provision cited above.
>
> Your application will be removed if you do not make modifications to bring it into compliance within 7 days of the issuance of this notification.  If you have additional applications in your catalog, please also review them for compliance.
>
> All violations are tracked. Serious or repeated violations of any nature will result in the termination of your developer account, and investigation and possible termination of related Google accounts. If your account is terminated, payments will cease and Google may recover the proceeds of any past sales and the cost of any associated fees (such as chargebacks and payment transaction fees) from you.
>
> Before uploading or publishing any new applications, please review the Developer Distribution Agreement and Content Policy.
>
> The Google Play Team

42.     After receiving the suspension notices from Google, most of the app developers that integrated the PCM SDK into their apps removed it.  The app developers who integrated the

---

[4] Inconsistently, not every app developer received a suspension warning notice from Google.  For example, Interchan, which was using Google's AdMob ad server, never received warning notices from Google.

PCM SDK were primarily individuals or small startups and could not afford to have their apps suspended for even one day. Further, because Google tracks all violations of its Developer Agreement and Developer Policies, these developers cannot risk having their developer accounts terminated.

43. Accordingly, when Google sent the suspension notices, the developers who integrated the PCM SDK removed the PCM SDK from their apps and pushed the update to their users. Most Android users choose to have their apps update automatically and, consequently, once they received the update, PCM was removed from their phones. The developers did this to avoid suspension and future adverse action from Google.

44. As a result of Google's suspension notices, the download rate for PCM dropped by over 50% in December 2013, to approximately 9 million downloads from approximately 20 million downloads in November 2013. The download rate continued to drastically decrease to 4.7 million downloads in January 2014 and 2.3 million in February 2014.

45. Several developers contacted StartApp after receiving the suspension notices from Google. StartApp and Callsome then began investigating the basis of Google's suspension notices.

46. Following the issuance of these suspension notices, Callsome attempted to contact Google through its appeal and customer support process, as well as through individuals who worked for Google. There was never a response to these attempts. Subsequently, on December 6, 2013, Zach Sivan, Callsome's Director and co-founder, contacted Matthew Bye at Google to ask why app developers that implemented the PCM SDK received suspension notices. Mr. Sivan told Mr. Bye that the app developers "removed our program from their apps and the distributors of this program have ceased all distribution activities which basically stopped our business going

forward completely." Mr. Sivan also informed Mr. Bye that "[m]ost of app developers [sic] are removing our program from their apps and none of the distributors we engaged is [sic] willing to take a risk and distribute an app that get such suspension notice [sic] from Google Play."

47. Having not received a response, Mr. Sivan contacted Mr. Bye again on December 12, 2013. Mr. Bye subsequently referred Mr. Sivan's concerns to Geoff Griffith, Google's senior counsel.

48. On December 18, 2013, Mr. Sivan wrote Mr. Griffith to determine why Google was sending suspension notices to app developers, providing examples of apps that were suspended.

49. On December 21, 2013, Mr. Griffith responded that the apps had not been suspended, but "received warnings for their implementation of another SDK, Start App Post Call Manager . . . ." On the same date, Mr. Sivan responded, informing Mr. Griffith that:

> The StartApp Post Call Manager is a reduced version of CallFlakes promoted by our partner Startapp to the developers I mentioned.
>
> I will be happy to learn how this post call manager is violating the Google policy so we can make sure implementation is done in the right way.
>
> None of our partners are willing to move ahead with CallFlakes until we can point out the problem with the post call manager.

50. On January 10, 2014, Mr. Griffith contacted Mr. Sivan, seeking clarification and additional information:

> Hi Zach,
>
> Sorry for the delay. It has taken me longer than expected to gather the information needed to respond, due to staff absences on holidays.
>
> I am consulting with our removals team further about this case and should be able to respond early next week.

In the meantime, I'd like to confirm what we are discussing here:  my understanding is that the third party apps that received warnings have implemented an SDK, PostCall Manager (PCM) developed by another third party, StartApp.  You have said that StartApp is a partner of your business that markets PCM as a reduced version of your product CallFlakes.  Can you provide more information on StartApp and its relation to your business?

Thanks,
Geoff

51.    On January 10, 2014, Mr. Sivan responded to Mr. Griffith's email, informing him that "PCM is a product developed by [Callsome] and it is a light version of CallFlakes.  Startapp is a mobile advertising network who distribute our PCM SDK to their community of app developers."

52.    On January 13, 2014, Mr. Griffith proffered the following explanation for the suspension notices:

Hi Zach,

Thanks for the information.

PCM is an SDK that can be implemented in a third party app to provide optional post-call functionality to the app if the user agrees to add it.  However, PCM is marketed as an "ad unit" to developers (e.g. on the website here) to help monetize their apps.  It also includes promotional content in the form of links to third party apps in the post-call screen.  PCM as a whole is therefore considered an advertising service that has been added to an app, rather than being a Play store app itself.  As such, PCM (and apps that implement it) are subject to our ad policy.  That policy contains the restrictions below:

• Ads may not interfere with other apps and their apps. For the PCM ad unit implementation to be compliant, it must display itself inside of the app it came with.  Today, it alters the functioning of the Phone app and the browser on the user's device.  Policy provision:

    o **Interfering with Apps and Third-party Ads**
    Ads associated with your app must not interfere with other apps or their ads.

• The implementation is an interstitial ad service, since it contains commercial links to third party apps, is full screen and must be dismissed by the user before the user can use the default contacts/phone UI after a phone call.  Policy provision:

    o **Ad Walls and Interstitial Ads**
Interstitial ads may only be displayed inside of the app they came with.

This is why the apps implementing PCM received warnings.

Kind regards,

Geoff

53.    Despite recognizing that PCM provided additional functionality to a user's mobile phone, Google took the position that PCM was an advertising service because it was marketed as an "ad unit." This position effectively precluded Callsome from distributing its PCM SDK to app developers and destroyed Callsome's business.

54.    Callsome forwarded Mr. Griffith's e-mail to StartApp, who provided the following response:

> We have learned this answer internally and it is our understanding that the post call manager cannot be distributed as an SDK to app developers through an ad funded model. Therefore, given the distribution cost involved, we will not be able to continue and distribute the Post Call Manager if it can't include an ad to support the business model.
>
> I am really sorry that this is where things stand. As you know, we really liked your product and so did our app developers but we cannot distribute anything that is considered by Google as a violation of its ad policy.

55.    In light of Google's position that the PCM SDK violated its ad policy, StartApp advised the developers who had integrated the PCM SDK to remove it from their apps.

56.    Google's reasons for claiming the PCM SDK violated its ad policy were false.

57.    PCM is not an "ad unit." PCM, as Google itself admitted, provides post-call functionality to users who agree to download it. All users who downloaded an app integrated with the PCM SDK were explicitly notified and agreed to download PCM. Thus, users agreed to download the additional functionality provided by PCM. The ads users see when using PCM are wholly contained within PCM and not outside of the app. In fact, the ads contained within PCM

only take up about 1/16th of the user's screen.   Consequently, PCM is neither an ad unit nor displays ads outside of PCM.

58.     The PCM SDK does not alter the phone app or the user's web browser.   PCM only appears after a call has ended and can easily be dismissed by the user.   PCM does not interfere with the user's ability to use or interact with the phone app.   PCM also does not change or alter the settings on the user's browser.   Although users may enter searches after a phone call has ended, in a search box powered by Yahoo (not Google) contained within PCM, it does not change any of the settings contained on the phone's browser.

59.     PCM is not an ad service and, as implemented, does not display interstitial ads.[5] As set forth above, Google's characterization of PCM as an ad unit or ad service is false because PCM provides additional functionality to increase productivity, which the user is expressly notified of and agrees to.   In fact, 90% of the time users used the productivity features offered by PCM.   Users only clicked the in-app ads 10% of the time, further demonstrating that users did not consider PCM to be an ad unit or ad service.   Accordingly, PCM's implementation and use of ads is consistent with Google's ad policy.

60.     Google falsely told Callsome, StartApp and developers implementing the PCM SDK that they were not compliant with Google's Developer Agreement or Developer Policies.

61.     Google's false statements to app developers who integrated the PCM SDK caused them to abandon and stop using the PCM SDK.   The app developers were compelled to stop integrating the PCM SDK because their success is predicated on being able to publish apps on the Google Play store, the premiere Android marketplace.   Simply put, app developers cannot

---

[5] Interstitial ads are full screen ads that a user can close with a close button. *See* https://support.google.com/webdesigner/answer/3250415?hl=en (last visited May 2014).

afford to be suspended or banned from the Google Play store, even if the reason given by Google is false.

62.     Google's false statements caused StartApp to stop offering the PCM SDK to app developers and affirmatively advise app developers that they should remove it from their apps. StartApp was compelled to stop offering the PCM SDK because its success as a mobile advertising platform is dependent on being able to offer app developers monetization solutions that comply with Google's Developer Policies so the app developers can publish on the Google Play store, the premiere Android marketplace.   Simply put, StartApp cannot afford to offer monetization solutions that will result in app developers being warned or suspended by Google, even if the basis for the warning or suspension is false.

63.     After StartApp stopped offering the PCM SDK, Interchan decided that it would no longer integrate the PCM SDK into any of the new apps it was developing and would be releasing.   Rather than remove the PCM SDK from its existing apps, Interchan simply left it integrated into the apps knowing that it would stop supporting and promoting these apps after releasing its new apps.

64.     Google's false statements have materially harmed Callsome.   StartApp and app developers have terminated their relationship with Callsome as a result of Google's false statements.   Google's false statements have greatly diminished Callsome's ability to earn income from Interchan and have otherwise foreclosed its ability to earn any income from its PCM SDK with StartApp even though it is fully compliant with Google's Developer Agreement and Developer Policies.   Callsome's relationships with third parties that wanted to offer the PCM SDK to app developers have also been terminated.   Google's false statements have practically destroyed Callsome's business.

65. Google's false statements have assured that Callsome can no longer develop, distribute, market or receive any benefit from its fully compliant PCM SDK, which was beneficial to users and profitable for Callsome.

## COUNT I – TORTIOUS INTERFERENCE WITH CALLSOME'S CONTRACT WITH STARTAPP

66. Callsome re-alleges paragraphs 1-65 as if fully set forth herein.

67. On March 18, 2013, Callsome entered into a contract with StartApp to develop and deliver the PCM SDK in return for StartApp offering the PCM SDK "as a new monetization solution for mobile applications developers." As amended on August 1, 2013, Callsome and StartApp's contract would have expired on July 31, 2015, with automatic 24 month extensions unless either party provided written notice of its desire to terminate.

68. Callsome delivered the PCM SDK to StartApp and StartApp offered it to its developers. As set forth above, the PCM SDK was very popular amongst StartApp's developers with over 200 developers implementing the PCM SDK in 1902 apps.

69. By virtue of Mr. Sivan's e-mail dated December 21, 2013, and Mr. Griffith's e-mail dated January 10, 2014, Google knew that Callsome had a contractual relationship with StartApp to distribute the PCM SDK.

70. Google falsely informed Callsome, StartApp and developers that the PCM SDK violated its ad policy. Google knew that StartApp would not continue offering the PCM SDK if it violated Google's ad policy. Google also knew that Callsome could not bring the PCM SDK into compliance based on the false reasons it gave and the manner in which the PCM SDK was being distributed.

71. Upon learning that Google believed the PCM SDK was an advertising service that violated its ad policy, StartApp terminated its contract with Callsome.

72.     Google's tortious conduct has resulted in Callsome's inability to market, sell or otherwise profit from the PCM SDK as no advertiser, advertising service, advertising platform or developer will distribute or integrate an app or SDK that Google claims violates its Developer Agreement or Developer Policies.

73.     Wherefore, Callsome requests judgment be entered against Google for compensatory damages, punitive damages and any such further and other relief the Court deems proper.

## COUNT II – TORTIOUS INTERFERENCE WITH CALLSOME'S CONTRACTS WITH APP DEVELOPERS

74.     Callsome re-alleges paragraph 1-65 as if fully set forth herein.

75.     On September 15, 2013, Callsome and StartApp began offering the PCM SDK to developers.

76.     During the short period that the PCM SDK was offered, 247 developers integrated the PCM SDK into over 1900 apps.  Some of these developers include Wait What and Nikhil Kulria.

77.     By integrating the PCM SDK into the apps they developed and offered on the Google Play store, the developers were paid every time a user downloaded PCM along with their app.  Developers who integrated the PCM SDK into their apps were not bound to continue using it and could decide to use a different SDK offered by Startapp or any other competitor at any time.

78.     Google knows which developers use its advertising SDKs as such developers must sign up to use these SDKs.  In testing or reviewing the developers' apps who integrated the PCM SDK for compliance with the Developer Agreement or Developer Policies, Google knew

that these developers were not using Google's advertising SDKs, but were using a competing advertising SDK, in this case StartApp.  Google sent these developers suspension notices.

79.     The developers who integrated the PCM SDK removed the PCM SDK after receiving suspension warning notices from Google.  But for these suspension notices, the developers would have continued using the PCM SDK.

80.     Google's suspension notices informed the developers who integrated the PCM SDK into their apps that the PCM SDK violated Google's ad policy or uploaded users' call logs without notifying and obtaining user consent.  As set forth above, these reasons were knowingly false because the PCM SDK does not violate Google's ad policy or upload users' call logs.

81.     The developers who received these suspension notices were compelled to remove the PCM SDK from their apps because their success is contingent on being able to offer their apps on the Google Play store and maintain good standing with Google as a developer.  These developers simply cannot afford to have Google suspend their apps and, as a result, simply capitulate when Google asserts their apps violate Google's policies.

82.     In fact, once it became clear Callsome could not bring the PCM SDK into compliance with Google's purported ad policy violation, StartApp e-mailed all of the developers who integrated the PCM SDK to remove it.  StartApp was required to take this action to maintain credibility with its developers and because StartApp's success is contingent on being able to offer developers SDKs that are compliant with Google's Developer Agreement and Developer Policies.

83.     Google's tortious conduct has resulted in Callsome's inability to market, sell or otherwise profit from the PCM SDK as no advertiser, advertising service, advertising platform or

developer will distribute or integrate an app or SDK that Google claims violates its Developer Agreement or Developer Policies.

84.     Wherefore, Callsome requests judgment be entered against Google for compensatory damages, punitive damages and any such further and other relief the Court deems proper.

## COUNT III – TORTIOUS INTERFERENCE WITH CALLSOME'S PROSPECTIVE RELATIONSHIP WITH ASK PARTNER NETWORK AND MASSIVE IMPACT

85.     Callsome re-alleges paragraphs 1-65 as if fully set forth herein.

86.     On September 15, 2013, Callsome and StartApp began offering the PCM SDK to developers.

87.     During the short period that the PCM SDK was offered, 247 developers integrated the PCM SDK into over 1900 apps.  Some of these developers included Escape Mobile, Wait What and Nikhil Kulria.

88.     As a result of the PCM SDK's popularity, Callsome began negotiating with Ask Partner Network and Massive Impact to distribute its PCM SDK.

89.     Callsome had an agreement in principle with Ask Partner Network to distribute the PCM SDK to app developers.

90.     Callsome was also negotiating with Massive Impact to distribute its PCM SDK.

91.     In November 2013, Google began sending suspension notices to developers that had integrated the PCM SDK.

92.     Ask Partner Network learned that StartApp removed the PCM SDK from its site and was notifying its developers to remove the PCM SDK from their apps.  Accordingly, Ask Partner Network contacted Callsome to determine why the PCM SDK was not compliant with Google's policies.

93.   As set forth above, Callsome contacted Google to obtain an explanation for the suspension warning notices.

94.   In the numerous e-mails sent to obtain an explanation, Callsome informed Google that "[m]ost of app developers [sic] are removing our program from their apps and none of the distributors we engaged is [sic] willing to take a risk and distribute an app that get such suspension notice [sic] from Google Play."   Callsome also told Google that since it began sending suspension warning notices that "all our distributors stopped working with us, an investment deal that was about to sign [sic] has been backed off and basically there is a huge decline in download rate."   Thus, Callsome informed Google that the distributors Callsome had engaged had stopped working with it due to Google's suspension warning notices.

95.   As set forth above, Google falsely told Mr. Sivan that the PCM SDK was an ad unit and advertising service that did not comply with Google's ad policy.   Callsome relayed Google's response to Ask Partner Network and Massive Impact.   Both subsequently declined to work any further with Callsome.

96.   Google's tortious conduct terminated the potential contractual relationships Callsome was negotiating with Ask Partner Network and Massive Impact.   Despite knowing of these relationships, Google falsely stated that the PCM SDK was not compliant with its ad policy.   Google's tortious actions have resulted in Callsome's inability to market, sell or otherwise profit from the PCM SDK as no advertiser, advertising service, advertising platform or developer will distribute or integrate an app or SDK that Google claims violates its Developer Agreement or Developer Policies.

97.   Wherefore, Callsome requests judgment be entered against Google for compensatory damages, punitive damages and any such further and other relief the Court deems proper.

## COUNT IV – TRADE LIBEL

98.   Callsome re-alleges paragraphs 1-65 as if fully set forth herein.

99.   Google told app developers, StartApp and Callsome that apps which integrated the PCM SDK violated its Developer Policies.

100.   Contrary to Google's statements, the PCM SDK is fully compliant with Google's Developer Policies.

101.   Google's false statements of non-compliance were intended to prevent app developers from integrating the PCM SDK into their apps.

102.   Google's false statements of non-compliance resulted in app developers and StartApp terminating their relationships with Callsome.

103.   Google's false statements of non-compliance resulted in Interchan deciding not to integrate the PCM SDK into any of the new apps it offered.

104.   As a result of Google's false statements, Callsome has suffered the following damages:

    a.   $32,700,000 in estimated lost advertising revenue from StartApp abandoning the PCM SDK and being forced to stop offering the PCM SDK to app developers;

    b.   $19,525,000 in estimated lost advertising revenue from Ask Partner Network who refused to contract with Callsome after learning of Google's suspension notices;

c.  $19,525,000 in estimated lost advertising revenue from Massive Impact who refused to contract with Callsome after learning of Google's suspension notices; and

d.  Attorney's fees and costs.

105.    Wherefore, Callsome requests judgment be entered against Google for compensatory damages, punitive damages and any such further and other relief the Court deems proper.

Dated:  June 25, 2014                              Respectfully submitted,

                                                  MILBERG LLP


                                                  By: _____
                                                  Todd Kammerman
                                                  tkammerman@milberg.com
                                                  One Pennsylvania Plaza
                                                  49th Floor
                                                  New York, New York  10119-0165
                                                  Telephone: (212) 594-5300

                                                  Attorneys for Callsome Solutions, Inc.

Exhibit A



# Developer Distribution Agreement

### Definitions

**Google:** Google Inc., a Delaware corporation with principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States.

**Device:** Any device that can access the Market, as defined herein.

**Products:** Software, content and digital materials distributed via the Market.

**Market:** The marketplace Google has created and operates which allows registered Developers in certain countries to distribute Products directly to users of Devices.

**Developer or You:** Any person or company who is registered and approved by the Market to distribute Products in accordance with the terms of this Agreement.

**Developer Account:** A publishing account issued to Developers that enables the distribution of Products via the Market.

**Payment Processor(s):** Any party authorized by Google to provide payment processing services that enable Developers with optional Payment Accounts to charge Device users for Products distributed via the Market.

**Payment Account:** A financial account issued by a Payment Processor to a Developer that authorizes the Payment Processor to collect and remit payments on the Developer's behalf for Products sold via the Market. Developers must be approved by a Payment Processor for a Payment Account and maintain their account in good standing to charge for Products distributed in the Market.

**Authorized Carrier:** A mobile network operator who is authorized to receive a distribution fee for Products that are sold to users of Devices on its network.

# 1. Introduction

1.1 The Market is a publicly available site on which Android Developers can distribute Products for Devices. In order to distribute Products on the Market, you must acquire and maintain a valid Developer Account.

1.2 If you want to charge a fee for your Products, you must also acquire and maintain a valid Payment Account from an authorized Payment Processor.

## 2. Accepting this Agreement

2.1 This agreement ("Agreement") forms a legally binding contract between you and Google in relation to your use of the Market to distribute Products. In order to use the Market to distribute Products, you must first agree to this Agreement by clicking to accept where this option is made available to you. You may not distribute Products on the Market if you do not accept this Agreement.

2.2 You may not use the Market to distribute Products and may not accept the Agreement unless you are verified as a Developer in good standing. This Agreement will automatically terminate if you are (a) not a Developer in good standing, or (b) a person or entity barred from using Android software under the laws of the United States or other countries including the country in which you are resident or from which you use the Android software.

2.3 If you are agreeing to be bound by this Agreement on behalf of your employer or other entity, you represent and warrant that you have full legal authority to bind your employer or such entity to this Agreement. If you do not have the requisite authority, you may not accept the Agreement or use the Market on behalf of your employer or other entity.

## 3. Pricing and Payments.

3.1 This Agreement covers both Products you choose to distribute for free and Products for which you charge a fee (once payment processing is enabled on the Market). In order to charge a fee for your Products, you must have a valid Payment Account under a separate agreement with a Payment Processor. If you already have a Payment Account with a Payment Processor before signing up for the Market, then the terms of this Agreement shall supersede your Payment Account terms and condition for Products sold via the Market.

You may set the price for your Products in the currencies permitted by the Payment Processor. The Market may display to users the price of Products in their native currency, but it is not responsible for the accuracy of currency rates or conversion

3.2 The price you set for Products will determine the amount of payment you will receive. A Transaction Fee, as defined below, will be charged on the sales price and apportioned to the Payment Processor and, if one exists, the Authorized Carrier. The remainder (sales price less Transaction Fee) will be remitted to you. The "Transaction Fee" is set forth here and may be revised by Google from time to time. Developer is responsible for determining if a Product is taxable and the applicable tax rate for the Payment Processor to collect for each taxing jurisdiction where Products are sold. Developer is responsible for remitting taxes to the appropriate taxing authority.

3.3 You may also choose to distribute Products for free. If the Product is free, you will not be charged a Transaction Fee. You may not collect future charges from users for copies of the Products that those users were initially allowed to download for free. This is not intended to prevent distribution of free trial versions of the Product with an "upsell" option to obtain the full version of the Product: Such free trials for Products are encouraged. However, if you want to collect fees after the free trial expires, you must collect all fees for the full version of the Product through the Payment Processor on the Market. In this Agreement, "free" means there are no charges or fees of any kind for use of the Product. All fees received by Developers for Products distributed via the Market must be processed by the Market's Payment Processor.

3.4 **Special Refund Requirements.** The Payment Processor's standard terms and conditions regarding refunds will apply except the following terms apply to your distribution of Products on the Market.

Products that can be previewed by the buyer (such as ringtones and wallpapers): No refund is required or allowed.

Products that cannot be previewed by the buyer (such as applications): You authorize Google to give the buyer a full refund of the Product price if the buyer requests the refund within 48 hours after purchase.

3.5 **You Support Your Product.** You will be solely responsible for support and maintenance of your Products and any complaints about your Products. Your contact information will be displayed in each application detail page and made available to users for customer support purposes.

Failure to provide adequate support for your Products may result in low Product ratings, less prominent product exposure, low sales and billing disputes. Except in cases when multiple disputes are initiated by a user with abnormal dispute history, billing disputes received by Payment Processor for Products sold for less than $10 may be automatically charged back to the Developer, in addition to any handling fees charged by the Payment Processor. Chargeback requests for Products $10 or more will be handled in accordance with the Payment Processor's standard policy.

3.6 **Reinstalls.** Users are allowed unlimited reinstalls of each application distributed via the Market, provided however that if you remove a Product(s) from the Market pursuant to clauses (i), (ii), (iii) or (iv) of Section 7.1, such Product(s) shall be removed from all portions of the Market and users shall no longer have a right or ability to reinstall the affected Products.

# 4. Use of the Market by You

4.1 Except for the license rights granted by you in Section 5 below, Google agrees that it obtains no right, title or interest from you (or your licensors) under this Agreement in or to any of Products, including any intellectual property rights which subsist in those applications.

4.2 You agree to use the Market only for purposes that are permitted by (a) this Agreement and (b) any applicable law, regulation or generally accepted practices or guidelines in the relevant jurisdictions (including any laws regarding the export of data or software to and from the United States or other relevant countries).

4.3 You agree that if you use the Market to distribute Products, you will protect the privacy and legal rights of users. If the users provide you with, or your Product accesses or uses, user names, passwords, or other login information or personal information, you must make the users aware that the information will be available to your Product, and you must provide legally adequate privacy notice and protection for those users. Further, your Product may only use that information for the limited purposes for which the user has given you permission to do so. If your Product stores personal or sensitive information provided by users, it must do so securely and only for as long as it is needed. But if the user has opted into a separate agreement with you that allows you or your Product to store or use personal or sensitive information directly related to your Product (not including other products or applications) then the terms of that separate agreement will

govern your use of such information. If the user provides your Product with Google Account information, your Product may only use that information to access the user's Google Account when, and for the limited purposes for which, the user has given you permission to do so.

4.4 **Prohibited Actions.** You agree that you will not engage in any activity with the Market, including the development or distribution of Products, that interferes with, disrupts, damages, or accesses in an unauthorized manner the devices, servers, networks, or other properties or services of any third party including, but not limited to, Android users, Google or any mobile network operator. You may not use customer information obtained from the Market to sell or distribute Products outside of the Market.

4.5 **Non-Compete.** You may not use the Market to distribute or make available any Product whose primary purpose is to facilitate the distribution of software applications and games for use on Android devices outside of the Market.

4.6 You agree that you are solely responsible for (and that Google has no responsibility to you or to any third party for) any Products you distribute through the Market and for the consequences of your actions (including any loss or damage which Google may suffer) by doing so.

4.7 You agree that you are solely responsible for (and that Google has no responsibility to you or to any third party for) any breach of your obligations under this Agreement, any applicable third party contract or terms of service, or any applicable law or regulation, and for the consequences (including any loss or damage which Google or any third party may suffer) of any such breach.

4.8 The Market will allow you to protect your Products so that users may not share Products with other users or devices.

4.9 **Product Ratings.** The Market will allow users to rate Products. Only users who download the applicable Product will be able to rate it. Product ratings will be used to determine the placement of Products on the Market with higher rated Products generally given better placement, subject to Google's ability to change placement at Google's sole discretion. The Market may also assign you a composite score for any Product that has not received user ratings. A Developer Composite Score will be a representation of the quality of your Product based on your history and will be determined at Google's sole discretion. For new Developers without Product history, Google may use or publish performance measurements such as uninstall and/or refund rates to identify or remove

Products that are not meeting acceptable standards, as determined by Google. Google reserves the right to display Products to users in a manner that will be determined at Google's sole discretion.

Your Products may be subject to user ratings to which you may not agree. You may contact Google if you have any questions or concerns regarding such ratings.

4.10 **Marketing Your Product.** You will be responsible for uploading your Products to the Market, providing required Product information to users, and accurately disclosing the security permissions necessary for the Product to function on user Devices. Products that are not properly uploaded will not be published in the Market.

4.11 Restricted Content. Any Product you distribute on the Market must adhere to the Developer Program Policies.

# 5. License Grants

5.1 You grant to Google a nonexclusive, worldwide, and royalty-free license to: copy, perform, display, and use the Products for administrative and demonstration purposes in connection with the operation and marketing of the Market and to use the Products to make improvements to the Android platform.

5.2 You grant to Google a nonexclusive, and royalty-free license to distribute the Products according to the publishing options selected by you on the Product upload page of the Market.

5.3 Google may use consultants and other contractors in connection with the performance of obligations and exercise of rights under this agreement, provided that such consultants and contractors will be subject to the same obligations as Google. After termination of this Agreement, Google will not distribute your Product, but may retain and use copies of the Product for support of the Market and the Android platform.

5.4 You grant to the user a non-exclusive, worldwide, and perpetual license to perform, display, and use the Product on the Device. If you choose, you may include a separate end user license agreement (EULA) in your Product that will govern the user's rights to the Product in lieu of the previous sentence.

5.5 You represent and warrant that you have all intellectual property rights, including all necessary patent, trademark, trade secret, copyright or other proprietary rights, in and to

the Product. If You use third-party materials, You represent and warrant that you have the right to distribute the third-party material in the Product. You agree that You will not submit material to Market that is copyrighted, protected by trade secret or otherwise subject to third party proprietary rights, including patent, privacy and publicity rights, unless You are the owner of such rights or have permission from their rightful owner to submit the material.

# 6. Brand Features and Publicity

6.1 **"Brand Features"** means the trade names, trade marks, service marks, logos, domain names, and other distinctive brand features of each party, respectively, as owned (or licensed) by such party from time to time.

6.2 Each party shall own all right, title and interest, including without limitation all intellectual property rights, relating to its Brand Features. Except to the limited extent expressly provided in this Agreement, neither party grants, nor shall the other party acquire, any right, title or interest (including, without limitation, any implied license) in or to any Brand Features of the other party. Subject to the terms and conditions of this Agreement, Developer grants to Google and its affiliates a limited, non-exclusive license during the term of this Agreement to display Developer Brand Features, submitted by Developer to Google, for use solely online or on mobile devices and in either case solely in connection with the distribution and sale of Developer's Product through the Market, or to otherwise fulfill its obligations under this Agreement. If Developer discontinues the distribution of specific Products on the Market, Google will cease use of the discontinued Products' Brand Features pursuant to this Section 6.2, except as necessary to allow Google to effectuate Section 3.6. Nothing in this Agreement gives Developer a right to use any of Google's trade names, trademarks, service marks, logos, domain names, or other distinctive brand features.

6.3 **Publicity.** In addition to the license granted in 6.2 above, for purposes of marketing the presence, distribution and sale of the Developer's Product in the Market, Google and its affiliates may include Developer Brand Features, submitted by Developer to Google: (i) within the Market and in any Google-owned online or mobile properties; (ii) in online or mobile communications outside the Market when mentioned along with other Market Products; (iii) when making announcements of the availability of the Product online or on mobile devices; (iv) in presentations; and (v) in customer lists which appear either online or on mobile devices (which includes, without limitation, customer lists posted on Google

websites). If Developer discontinues the distribution of specific Products on the Market, Google will cease use of the discontinued Products' Brand Features for such marketing purposes. Google grants to Developer a limited, non-exclusive, worldwide, royalty-free license to use the Android Brand Features for the term of this Agreement solely for marketing purposes and only in accordance with the Android Brand Guidelines).

# 7. Product Takedowns.

7.1 **Your Takedowns.** You may remove your Products from future distribution via the Market at any time, but you must comply with this Agreement and the Payment Processor's Payment Account terms of service for any Products distributed through the Market, including but not limited to refund requirements. Removing your Products from future distribution via the Market does not (a) affect the license rights of users who have previously purchased or downloaded your Products, (b) remove your Products from Devices or from any part of the Market where previously purchased or downloaded applications are stored on behalf of users, or (c) change your obligation to deliver or support Products or services that have been previously purchased or downloaded by users. Notwithstanding the foregoing, in no event will Google maintain on any portion of the Market (including, without limitation, the part of the Market where previously purchased or downloaded applications are stored on behalf of users) any Product that you have removed from the Market and provided written notice to Google that such removal was due to (i) an allegation of infringement, or actual infringement, of any copyright, trademark, trade secret, trade dress, patent or other intellectual property right of any person, (ii) an allegation of defamation or actual defamation, (iii) an allegation of violation, or actual violation, of any third party's right of publicity or privacy, or (iv) an allegation or determination that such Product does not comply with applicable law.

If you remove a Product from the Market pursuant to clauses (i), (ii), (iii) or (iv) of this Section 7.1, and an end user purchased such Product within a year before the date of takedown, at Google's request, you must refund to the affected end user all amounts paid by such end user for such affected Product, less the portion of the Transaction Fee specifically allocated to the credit card/payment processing for the associated transaction.

7.2 **Google Takedowns.** While Google does not undertake an obligation to monitor the Products or their content, if Google is notified by you or otherwise becomes aware and determines in its sole discretion that a Product or any portion thereof or your Brand Features; (a) violates the intellectual property rights or any other rights of any third party;

(b) violates any applicable law or is subject to an injunction; (c) is pornographic, obscene or otherwise violates Google's hosting policies or other terms of service as may be updated by Google from time to time in its sole discretion; (d) is being distributed by you improperly; (e) may create liability for Google or Authorized Carriers; (f) is deemed by Google to have a virus or is deemed to be malware, spyware or have an adverse impact on Google's or an Authorized Carrier's network; (g) violates the terms of this Agreement or the Developer Program Policies for Developers; or (h) the display of the Product is impacting the integrity of Google servers (i.e., users are unable to access such content or otherwise experience difficulty), Google may remove the Product from the Market or reclassify the Product at its sole discretion. Google reserves the right to suspend and/or bar any Developer from the Market at its sole discretion.

Google enters into distribution agreements with device manufacturers and Authorized Carriers to place the Market software client application for the Market on Devices. These distribution agreements may require the involuntary removal of Products in violation of the Device manufacturer's or Authorized Carrier's terms of service.

In the event that your Product is involuntarily removed because it is defective, malicious, infringes intellectual property rights of another person, defames, violates a third party's right of publicity or privacy, or does not comply with applicable law, and an end user purchased such Product within a year before the date of takedown,: (i) you must refund to Google, all amounts received, plus any associated fees (i.e. chargebacks and payment transaction fees), and (ii) Google may, at its sole discretion, withhold from your future sales the amount in subsection (i) above.

# 8. Your Developer Credentials

8.1 You agree that you are responsible for maintaining the confidentiality of any developer credentials that may be issued to you by Google or which you may choose yourself and that you will be solely responsible for all applications that are developed under your developer credentials. Google may limit the number of Developer Accounts issued to you or to the company or organization you work for.

# 9. Privacy and Information

9.1 In order to continually innovate and improve the Market, Google may collect certain usage statistics from the Market and Devices, including but not limited to, information on how the Market and Devices are being used.

9.2 The data collected is examined in the aggregate to improve the Market for users and Developers and is maintained in accordance with Google's Privacy Policy. To ensure the improvement of Products, limited aggregate data may be available to you upon written request.

# 10. Terminating this Agreement

10.1 This Agreement will continue to apply until terminated by either you or Google as set out below.

10.2 If you want to terminate this Agreement, you must provide Google with thirty (30) days prior written notice (unless this Agreement terminates under Section 14.1) and cease your use of any relevant developer credentials.

10.3 Google may at any time, terminate this Agreement with you if:

(A) you have breached any provision of this Agreement; or

(B) Google is required to do so by law; or

(C) you cease being an authorized Developer; or

(D) Google decides to no longer provide the Market.

# 11. DISCLAIMER OF WARRANTIES

11.1 YOU EXPRESSLY UNDERSTAND AND AGREE THAT YOUR USE OF THE MARKET IS AT YOUR SOLE RISK AND THAT THE MARKET IS PROVIDED "AS IS" AND "AS AVAILABLE" WITHOUT WARRANTY OF ANY KIND.

11.2 YOUR USE OF THE MARKET AND ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE MARKET IS AT YOUR OWN DISCRETION AND RISK AND YOU ARE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER SYSTEM OR OTHER DEVICE OR LOSS OF DATA THAT RESULTS FROM SUCH USE.

11.3 GOOGLE FURTHER EXPRESSLY DISCLAIMS ALL WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

# 12. LIMITATION OF LIABILITY

12.1 YOU EXPRESSLY UNDERSTAND AND AGREE THAT GOOGLE, ITS SUBSIDIARIES AND AFFILIATES, AND ITS LICENSORS SHALL NOT BE LIABLE TO YOU UNDER ANY THEORY OF LIABILITY FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL CONSEQUENTIAL OR EXEMPLARY DAMAGES THAT MAY BE INCURRED BY YOU, INCLUDING ANY LOSS OF DATA, WHETHER OR NOT GOOGLE OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF OR SHOULD HAVE BEEN AWARE OF THE POSSIBILITY OF ANY SUCH LOSSES ARISING.

# 13. Indemnification

13.1 To the maximum extent permitted by law, you agree to defend, indemnify and hold harmless Google, its affiliates and their respective directors, officers, employees and agents, and Authorized Carriers from and against any and all third party claims, actions, suits or proceedings, as well as any and all losses, liabilities, damages, costs and expenses (including reasonable attorneys fees) arising out of or accruing from (a) your use of the Market in violation of this Agreement, and (b) your Product that infringes any copyright, trademark, trade secret, trade dress, patent or other intellectual property right of any person or defames any person or violates their rights of publicity or privacy.

13.2 To the maximum extent permitted by law, you agree to defend, indemnify and hold harmless the applicable Payment Processors (which may include Google and/or third parties) and the Payment Processors' affiliates, directors, officers, employees and agents from and against any and all third party claims, actions, suits or proceedings, as well as any and all losses, liabilities, damages, costs and expenses (including reasonable attorneys fees) arising out of or accruing from taxes related to Your distribution of Products distributed via the Market.

# 14. Changes to the Agreement

14.1 Google may make changes to this Agreement at any time by sending the Developer notice by email describing the modifications made. Google will also post a notification on the Market site describing the modifications made. The changes will become effective, and will be deemed accepted by Developer, (a) immediately for those who become Developers after the notification is posted, or (b) for pre-existing Developers, the modified Agreement will become effective upon Developer's acceptance of the modified Agreement (except changes required by law which will be effective immediately). Pre-existing Developers will show their acceptance of the modified Agreement by going to the Market site and accepting the modified Agreement. In the event that Developer does not agree with the modifications to the Agreement within thirty (30) days after the date the email is sent, then Google will suspend the distribution of your Products until Developer agrees to the modified Agreement. In the event that You do not agree with the modifications within ninety (90) days after the date the email is sent, then You must terminate your use of the Market, which will be your sole and exclusive remedy.

# 15. General Legal Terms

15.1 This Agreement constitutes the whole legal agreement between you and Google and governs your use of the Market, and completely replaces any prior agreements between you and Google in relation to the Market.

15.2 You agree that if Google does not exercise or enforce any legal right or remedy which is contained in this Agreement (or which Google has the benefit of under any applicable law), this will not be taken to be a formal waiver of Google's rights and that those rights or remedies will still be available to Google.

15.3 If any court of law, having the jurisdiction to decide on this matter, rules that any provision of this Agreement is invalid, then that provision will be removed from this Agreement without affecting the rest of this Agreement. The remaining provisions of this Agreement will continue to be valid and enforceable.

15.4 You acknowledge and agree that each member of the group of companies of which Google is the parent shall be third party beneficiaries to this Agreement and that such other companies shall be entitled to directly enforce, and rely upon, any provision of this Agreement that confers a benefit on (or rights in favor of) them. Other than this, no other person or company shall be third party beneficiaries to this Agreement.

15.5 EXPORT RESTRICTIONS. PRODUCTS ON THE MARKET MAY BE SUBJECT TO UNITED STATES EXPORT LAWS AND REGULATIONS. YOU MUST COMPLY WITH ALL DOMESTIC AND INTERNATIONAL EXPORT LAWS AND REGULATIONS THAT APPLY TO YOUR DISTRIBUTION OR USE OF PRODUCTS. THESE LAWS INCLUDE RESTRICTIONS ON DESTINATIONS, USERS AND END USE.

15.6 The rights granted in this Agreement may not be assigned or transferred by either you or Google without the prior written approval of the other party. Neither you nor Google shall be permitted to delegate their responsibilities or obligations under this Agreement without the prior written approval of the other party.

15.7 This Agreement, and your relationship with Google under this Agreement, shall be governed by the laws of the State of California without regard to its conflict of laws provisions. You and Google agree to submit to the exclusive jurisdiction of the courts located within the county of Santa Clara, California to resolve any legal matter arising from this Agreement. Notwithstanding this, you agree that Google shall still be allowed to apply for injunctive remedies (or an equivalent type of urgent legal relief) in any jurisdiction.

15.8 The obligations in Sections 5, 6.2 (solely as necessary to permit Google to effectuate Section 3.6), 7, 11, 12, 13, and 15 will survive any expiration or termination of this Agreement.

---

© Google  ·  Privacy & Terms  ·  Help          United States ▾

Exhibit B



# Google Play Developer Program Policies

The policies listed below play an important role in maintaining a positive experience for everyone using Google Play. Defined terms used here have the same meaning as in the Developer Distribution Agreement. Be sure to check back from time to time, as these policies may change.

**Content Policies**

Our content policies apply to any content your app displays or links to, including any ads it shows to users and any user-generated content it hosts or links to. Further, they apply to any content from your developer account which is publicly displayed in Google Play, including your developer name and the landing page of your listed developer website. In addition to complying with these policies, the content of your app must be rated in accordance with our Content Rating Guidelines.

- **Sexually Explicit Material:** Apps that contain or promote pornography are prohibited; this includes sexually explicit or erotic content, icons, titles, or descriptions. Google has a zero-tolerance policy against child sexual abuse imagery. If we become aware of content with child sexual abuse imagery, we will report it to the appropriate authorities and delete the Google Accounts of those involved with the distribution.
- **Violence and Bullying:** Depictions of gratuitous violence are not allowed. Apps should not contain materials that threaten, harass or bully other users.
- **Hate Speech:** We don't allow content advocating against groups of people based on their race or ethnic origin, religion, disability, gender, age, veteran status, or sexual orientation/gender identity.
- **Impersonation or Deceptive Behavior:** Don't pretend to be someone else, and don't represent that your app is authorized by or produced by another company or organization if that is not the case. Products or the ads they contain also must not mimic functionality or warnings from the operating system or other apps. Products must not contain false or misleading information in any content, title, icon, description, or screenshots. Developers must not divert users or provide links to any

other site that mimics or passes itself off as another app or service. Apps must not have names or icons that appear confusingly similar to existing products, or to apps supplied with the device (such as Camera, Gallery or Messaging).

- **Intellectual Property:** Don't infringe on the intellectual property rights of others, (including patent, trademark, trade secret, copyright, and other proprietary rights), or encourage or induce infringement of intellectual property rights. We will respond to clear notices of alleged copyright infringement. For more information or to file a DMCA request, please visit our copyright procedures.

- **Personal and Confidential Information:** We don't allow unauthorized publishing or disclosure of people's private and confidential information, such as credit card numbers, government identification numbers, driver's and other license numbers, non-public contacts, or any other information that is not publicly accessible.

- **Illegal Activities:** Keep it legal. Don't engage in unlawful activities on this product, such as the sale of prescription drugs without a prescription.

- **Gambling:** We don't allow content or services that facilitate online gambling, including but not limited to, online casinos, sports betting and lotteries, or games of skill that offer prizes of cash or other value.

- **Dangerous Products:** We don't allow content that harms, interferes with the operation of, or accesses in an unauthorized manner, networks, servers, or other infrastructure.
  - Don't transmit or link to viruses, worms, defects, Trojan horses, malware, or any other items that may introduce security vulnerabilities to or harm user devices, apps, or personal data.
  - Apps that collect information (such as the user's location or behavior) without the user's knowledge (spyware) are prohibited.
  - Malicious scripts and password phishing scams are also prohibited on Google Play, as are apps that cause users to unknowingly download or install apps from sources outside of Google Play.
  - An app downloaded from Google Play may not modify, replace or update its own APK binary code using any method other than Google Play's update mechanism.

- **System Interference:**
  - An app downloaded from Google Play (or its components or derivative elements) must not make changes to the user's device outside of the app without the user's knowledge and consent.
  - This includes behavior such as replacing or reordering the default presentation of apps, widgets, or the settings on the device. If an app makes such changes

with the user's knowledge and consent, it must be clear to the user which app has made the change and the user must be able to reverse the change easily, or by uninstalling the app altogether.

○ Apps and their ads must not modify or add browser settings or bookmarks, add homescreen shortcuts, or icons on the user's device as a service to third parties or for advertising purposes.

○ Apps and their ads must not display advertisements through system level notifications on the user's device, unless the notifications derive from an integral feature provided by the installed app (e.g., an airline app that notifies users of special deals, or a game that notifies users of in-game promotions).

○ Apps must not encourage, incentivize, or mislead users into removing or disabling third-party apps except as part of a security service provided by the app.

## Network Usage and Terms

Apps must not create unpredictable network usage that has an adverse impact on a user's service charges or an Authorized Carrier's network. Apps also may not knowingly violate an Authorized Carrier's terms of service for allowed usage or any Google terms of service.

## Spam and Placement in the Store

Developers are important partners in maintaining a great user experience on Google Play.

- Do not post repetitive content.
- Do not use irrelevant, misleading, or excessive keywords in apps descriptions, titles, or metadata.
- Developers must not attempt to change the placement of any Product in the Store, or manipulate any product ratings or reviews by unauthorized means such as fraudulent installs, paid or fake reviews or ratings, or by offering incentives to rate products.
- Apps that are created by an automated tool or wizard service must not be submitted to Google Play by the operator of that service on behalf of other persons.
- Do not post an app where the primary functionality is to:
    ○ Drive affiliate traffic to a website or
    ○ Provide a webview of a website not owned or administered by you (unless you have permission from the website owner/administrator to do so)

- Do not send SMS, email, or other messages on behalf of the user without providing the user with the ability to confirm content and intended recipient.

## App Promotion

Apps published on Google Play may not directly or indirectly engage in or benefit from the following behavior:

- Promotion via deceptive ads on websites, apps or other properties, including simulated system, service, or app notifications or alerts.
- Promotion or install tactics which cause redirection to Google Play or the download of the app without informed user action.
- Unsolicited promotion via SMS services.

It is your responsibility to ensure that no ad network or affiliate uses such methods to direct users to pages that make your app available for download.

## Paid and Free Apps

- **App purchases:** Developers charging for apps and downloads from Google Play must do so by using Google Play's payment system.
- **In-app purchases:**
    - Developers offering virtual goods or currencies within a game downloaded from Google Play must use Google Play's in-app billing service as the method of payment.
    - Developers offering additional content, services or functionality within another category of app downloaded from Google Play must use Google Play's in-app billing service as the method of payment, except:
        - where payment is primarily for physical goods or services (e.g., buying movie tickets, or buying a publication where the price also includes a hard copy subscription); or
        - where payment is for digital content or goods that may be consumed outside of the app itself (e.g., buying songs that can be played on other music players).
- Developers must not mislead users about the apps they are selling nor about any in-app services, goods, content or functionality they are selling. If your product description on Google Play refers to in-app features to which a specific or additional charge applies, your description must clearly notify users that payment is required to access those features.

**Subscriptions and Cancellations**

Google's subscription cancellation policy is that a user will not receive a refund for the current billing period when canceling a subscription, but will continue to receive issues and updates of the relevant subscription content (if any) for the remainder of the billing period, regardless of the cancellation.

You (as the content or access provider) may implement a more flexible refund policy with your users directly, and it is your responsibility to notify your users of those policies and ensure that the policies comply with applicable law.

**Ad Policy**

The policy below covers all ads that are implemented in and bundled with apps. These rules are important in maintaining a positive experience for everyone using Android apps from Google Play. Be sure to check back from time to time, as these policies may change.

1. **Developer Terms apply to the entire user experience of your app**
   Please be aware that Google's Developer Distribution Agreement and Developer Program Policies (together, "Developer Terms") apply to each app as well as any ads or third-party libraries bundled or made available through the app. Offer your users a consistent, policy compliant, and well communicated user experience.

   Ads are considered part of your app for purposes of content review and compliance with the Developer Terms. Therefore all of the policies referenced above also apply. Please take care to use advertising which does not violate the Developer Terms.

   Ads which are inconsistent with the app's content rating also violate our Developer Terms.

2. **Ads Context**
   Ads must not simulate or impersonate the user interface of any app, or notification and warning elements of an operating system. It must be clear to the user which app each ad is associated with or implemented in.

3. **Ad Walls and Interstitial Ads**
   Interstitial ads may only be displayed inside of the app they came with. Forcing the user to click on ads or submit personal information for advertising purposes in order to fully use an app is prohibited. A prominent and accessible target must be made

available to users in any interstitial ad so they may dismiss the ad without penalty or inadvertent click-through.

4. **Interfering with Apps and Third-party Ads**
   Ads associated with your app must not interfere with other apps or their ads.

5. **Usage of Android advertising ID**

   Google Play Services version 4.0 introduced new APIs and an ID for use by advertising and analytics providers. Terms for the use of these APIs and ID are below.

   ◦ **Usage**. The <u>Android advertising identifier</u> must only be used for advertising and user analytics. The status of the "Opt out of Interest-based Advertising" setting must be verified on each access of the ID.
   ◦ **Association with personally-identifiable information or other identifiers**. The advertising identifier must not be connected to personally-identifiable information or associated with any persistent device identifier (for example: SSAID, MAC address, IMEI, etc.,) without the explicit consent of the user.
   ◦ **Respecting users' selections**. Upon reset, a new advertising identifier must not be connected to a previous advertising identifier or data derived from a previous advertising identifier without the explicit consent of the user. Furthermore, you must abide by a user's "opt out of interest-based advertising" setting. If a user has enabled this setting, you may not use the advertising identifier for creating user profiles for advertising purposes or for targeting users with interest-based advertising. Allowed activities include contextual advertising, frequency capping, conversion tracking, reporting and security and fraud detection.
   ◦ **Transparency to users**. The collection and use of the advertising identifier and commitment to these terms must be disclosed to users in a legally adequate privacy notification.
   ◦ **Abiding by the terms of use**. The advertising identifier may only be used in accordance with these terms, including by any party that you may share it with in the course of your business. Beginning August 1st 2014, all updates and new apps uploaded to the Play Store must use the advertising ID (when available on a device) in lieu of any other device identifiers for any advertising purposes.

**Policy Enforcement**

In the event that your app is removed from Google Play, you will receive an email notification to that effect. If you have any questions or concerns regarding a removal or a rating/comment from a user, you may contact us at http://support.google.com/googleplay/android-developer. Serious or repeated violations of the Developer Distribution Agreement or this Content Policy will result in account termination. Repeated infringement of intellectual property rights, including copyright, will also result in account termination. For more information on Google's copyright policies, please see here.

---

© Google  ·  Privacy & Terms  ·  Help          United States ▾